USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/27/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AJINOMOTO CO., INC. and
AJINOMOTO HEARTLAND INC.,

                      Plaintiffs,

-against-

CJ CHEILJEDANG CORP.,
CJ AMERICA, INC., and
PT CHEILJEDANG INDONESIA,

                      Defendants.

1:16-cv-03498 (MKV)

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

---

MARY KAY VYSKOCIL, United States District Judge:

This Matter comes before the Court on the motion of CJ America, Inc. (CJ America), CJ CheilJedang Corp. (CJ Korea), and PT. CheilJedang Indonesia (CJ Indonesia) (collectively CJ or Defendants) to partially dismiss the Second Amended Complaint (SAC) filed by Plaintiffs Ajinomoto Co., Inc. and Ajinomoto Heartland Inc. [ECF No. 71]. Having considered the parties' arguments, the Court partially grants the motion and partially denies the motion. This Court has jurisdiction under 28 U.S.C. § 1338(a).

## BACKGROUND[1]

### A. Parties

Ajinomoto is a global leader in amino acid research, development, and manufacturing. Ajinomoto asserts that Defendants have infringed two of its patents, U.S. Patent Nos. 7,666,655 (the '655 patent) and 6,180,373 (the '373 patent), which describe and claim novel methods of

---

[1] Unless otherwise noted, the facts are taken from the SAC, and are accepted as true for the purposes of this motion. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, this Court need not "accept as true all of the [legal conclusions] contained in a complaint." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

1

producing amino acids via genetic modifications to bacterial strains. [SAC ¶¶ 71–78]. Ajinomoto alleges that Defendants manufacture L-Tryptophan abroad using methods that infringe the methods claimed by the '373 and '655 patents. [*E.g.*, SAC ¶¶ 84–111]. Defendants then import, offer for sale, and sell the resulting products in the United States under the BestAmino<sup>TM</sup> brand (the accused products). [*E.g.*, SAC ¶¶ 84–111].

There are three named Defendants: (1) CJ Korea is a corporation organized under the laws of and with its principal place of business in the Republic of Korea, [SAC ¶ 4]; (2) CJ Indonesia is a wholly owned subsidiary of CJ Korea with a principal place of business in Indonesia, [SAC ¶¶ 6–7, 13]; and (3) CJ America is a New York corporation, a wholly owned subsidiary of CJ Korea, and a sister entity of CJ Indonesia, [SAC ¶¶ 5, 7]. CJ Korea is the parent company and is in the business of worldwide manufacture, distribution, and sale of amino acid products, including the sale in the United States of the accused products. [SAC ¶¶ 4–8, 10–27 (citing Ex. 5–14)]. CJ Indonesia manufactures the accused products, which are then imported and sold in the United States. [SAC ¶¶ 6–7, 13]. CJ America is CJ Korea's United States headquarters that oversees the import, distribution, and sale of the accused products in the United States. [SAC ¶¶ 5, 18 (citing Ex. 10)].

### B. Procedural History

In May 2016, Ajinomoto filed suit in this Court and in the International Trade Commission (ITC) against the Defendants. At the request of the parties, the present action was stayed pending resolution of the ITC case. [ECF No. 13]. In December 2017, the ITC issued its final decision finding that Defendants' manufacture and importation of all accused products infringed the '373 patent and finding that Defendants' manufacture and importation of some of the accused products also infringed the '655 patent. *In the Matter of Certain L-Tryptophan, L-*

*Tryptophan Prod., & Their Methods of Prod. Comm'n Opinion*, USITC Inv. No. 337-TA-1005, 2018 WL 8648370, at *10–14, *16–24 (Jan. 11, 2018). The ITC issued a cease-and-desist order against CJ America and limited exclusion order against the accused products, prohibiting further importation and sale of the infringing products in the United States. *Id.* at *26–27. The Federal Circuit affirmed the ITC's decision on the '655 patent and did not address the '373 patent.[2] *Ajinomoto Co. v. Int'l Trade Comm'n*, 932 F.3d 1342, 1361 (Fed. Cir. 2019). Defendants' petitions for rehearing and certiorari were denied.

During the ITC proceeding, Defendants filed two petitions for *inter partes* review at the United States Patent and Trademark Office (USPTO), challenging the validity of both patents. The USPTO denied both challenges. [SAC ¶¶ 15, 82–83].

In July 2020, following conclusion of the ITC and USPTO proceedings, this Court lifted its stay and, with leave of the Court, [ECF No. 68], Ajinomoto amended its complaint to include the findings of the ITC. [ECF No. 58]. Defendants then filed a pre-motion letter raising myriad challenges. [*See* ECF Nos. 60, 61]. At the ensuing hearing, Judge Koeltl concluded that Ajinomoto should file a second amended complaint, following which Defendants would have the right to file their motion. [ECF No. 68 at 8–9, 11, 17–18]. Thereafter, Ajinomoto filed its SAC and Defendants filed their motion.

Ajinomoto alleges six counts in its complaint. In Counts I and II, Ajinomoto asserts that CJ Corp, CJ America, and CJ Indonesia directly infringed the '655 [SAC ¶¶ 112–125] and '373 [SAC ¶¶ 126–139] patents respectively under 35 U.S.C. § 271(g). In Counts III and IV, Ajinomoto asserts in the alternative that each Defendant is liable for inducing infringement of

---

[2] Because the '373 patent expired on January 30, 2018, the ITC ultimately vacated its decision as to that patent for mootness. *Ajinomoto*, 932 F.3d at 1347 n.3.

3

each patent under 35 U.S.C. § 271(b). [SAC ¶¶ 140–174]. In Counts V and VI, Ajinomoto asserts that each Defendant's infringement of the '655 and '373 patents is and has been willful. [SAC ¶¶ 175–191].

By their motion, Defendants seek partial dismissal of the Second Amended Complaint, arguing under Fed. R. Civ. P. 12(b)(6) that Plaintiffs have failed to state a claim upon which relief can be granted regarding Counts III, IV, V, and VI as against all three Defendants, and regarding Counts I and II as against CJ Corp and CJ Indonesia. Defendants do not challenge the sufficiency of Ajinomoto's allegations of § 271(g) infringement by CJ America. (Defendant's Memorandum in Support of their Motion to Dismiss (Def. Mot.) [ECF No. 72], at 1 n.2; (Sept. 22, 2021 Oral Arg. Tr. (Tr.) [ECF No. 85], at 12:10–15).

## **LEGAL STANDARDS**

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alterations, internal quotation marks, and citations omitted).

## ANALYSIS

### A. Group Pleading

Before proceeding to Defendants' arguments regarding the various counts in the SAC, the Court first addresses Defendants' argument, peppered throughout its brief, that Plaintiffs engaged in improper group pleading by lumping all the Defendants together as a unitary entity. Def. Mot. 4.  They further assert throughout their brief that Plaintiffs' SAC contains circular and contradictory pleadings with respect to the relationship/separate corporate existence of the defendants it groups together that preclude Plaintiffs' own arguments.  Def. Mot. 4–6, 16.

With respect to inconsistent pleadings, "a complaint may plead in the alternative." *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 616 n.10 (S.D.N.Y. 2003); *see also* Fed. R. Civ. P. 8(d)(2)-(3).  A plaintiff may not, however, be able to recover on both theories if the allegations conflict.  *Walker v. Carter*, No. 1:12-CV-05384 (ALC), 2014 WL 4363956, at *2 (S.D.N.Y. Sept. 3, 2014).  Under Rule 8(d)(2), "[a] party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count or . . . in separate ones." Fed. R. Civ. P. 8(d)(2).  Moreover, "[i]f a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  *Id*.  Furthermore, under Rule 8(d)(3), a party "may state as many separate claims . . . as it has, regardless of consistency."  *Id.*(d)(3).  "[T]he inconsistency may lie either in the statement of the facts or the legal theories adopted."  *Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994) (citation omitted).  Therefore, a factual allegation in one claim should not be construed as an admission against another alternative or inconsistent claim.  *See id.*

Nonetheless, Rule 8(d) does not give plaintiffs "license to plead inconsistent *assertions of facts* within the allegations that serve as the factual predicates for an independent, unitary claim."

5

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 407 (S.D.N.Y. 2001) (emphasis in original). "Internally conflicting factual assertions that constitute integral components of a claim must be distinguished from a permissible alternative statement embodying a theory of a whole sufficient claim." *Id.*

Defendant takes issue with Plaintiffs' pleadings regarding which CJ entities control which or whether the CJ entities are separate entities or one unitary entity.[3] It is true that the SAC contains inconsistent allegations. Throughout their pleadings, Plaintiffs regularly allege that each individual defendant entity took actions "directly, and/or through or under the direction or control of, or in contract or joint enterprise with, its agents or alter egos [the other two entities]." [SAC ¶¶ 118, 121, 123, 132, 135, 137]. It further alleges that each entity directly infringed "alone, or [] jointly with or attributable to one or more of the other named entities, because it is done through or under the direction or control of, in contract with, or in a joint enterprise with, one or more of the other named entities." [SAC ¶¶ 114, 142; *see also* SAC ¶¶ 115, 129, 147, 152, 155, 159, 165, 170, 173]. Last, Plaintiffs both allege that Defendants are liable for direct infringement in violation of § 271(g) as a unitary entity or in the alternative

---

[3] In their briefs, Defendants and Plaintiffs contest whether the information obtained during the investigation with the ITC was confidential or not. *See* Def. Mot. 5, 9, 18; Pl. Opp'n 4 n.4. The Court held oral arguments on Defendants' Motion to Dismiss on September 22, 2021. [ECF 85]. At the hearing, the parties informed the court that all the information obtained during the ITC investigation is under a protective order that can only be used in front of the ITC. (Tr. 25:16–19). The parties indicated though that there is a mechanism that they had been trying to work out whereby the ITC will issue all discovery into this proceeding. (Tr. 25:23–26:3). Both parties agreed at the hearing that they would give permission to allow that information to be brought over. (Tr. 31:5–10). However, the Court notes that at a hearing in this case in front of Judge Koeltl on September 11, 2020, Judge Koeltl recommended that Plaintiffs "mak[e] any amendments in the complaint [] clearer . . . [and add] whether the result of the ITC proceeding has provided the plaintiff with greater insights into what should and shouldn't be maintained . . . ." [ECF No. 68 at 11:18–21]. The Court finds it inexplicable that between that hearing and the hearing held on September 22, 2021, over a year later, the parties never agreed to this or even appeared to discuss it.

induced another entity to infringe in violation of § 271(b). Def. Mot. 16. Defendants argue that such pleadings do not give them "fair notice of what [the] plaintiff's claim is and the grounds upon which it rests." Def. Mot. 4.

These facts are inconsistent so that if Plaintiffs recover under one theory, he may not be able to recover under the other. *See Walker*, 2014 WL 4363956, at *2. However, when viewed as alternative claims at the initial pleading stage on a motion to dismiss, Rule 8(d)(2) allows the Court "to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as [the Court must do on] motions to dismiss . . . ." *Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999). Therefore, Plaintiffs' pleadings do not fail as an improper group pleading.

### B. Counts I and II: Infringement Under 35 U.S.C. § 271(g)

Plaintiffs' first two counts in their complaint allege that CJ Korea and CJ Indonesia are liable under § 271(g) for direct infringement. [SAC ¶¶ 112–139]. In addition to pleading that Defendants directly violated § 271(g), Ajinomoto also alleges that they are liable through the doctrines of principal-agency relationship, joint enterprise, or alter ego. Defendants challenge the sufficiency of these allegations on two grounds. First, Defendants argue that Plaintiffs have failed to allege facts sufficient to infer that either entity "import[ed] into the United States or offer[ed] to sell, s[old], or use[d] within the United States" the accused products. Def. Mot. 6. Second, Defendants claim that Plaintiffs have failed to allege sufficient facts to support a claim that either CJ Korea or CJ Indonesia are liable through a principal-agency relationship, joint enterprise, or alter ego. Def. Mot. 11.

#### 1. Direct Violation of § 271(g)

Under 35 U.S.C. § 271(g), "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent."  Ajinomoto's complaint pleads that CJ Korea and CJ Indonesia are liable under § 271(g) because they have and/or continue "to import, market, distribute, offer[] for sale, and/or sell in the United States accused products manufactured according to methods that infringe" the '655 and '373 patents.  [SAC ¶¶ 121, 123, 135, 137].  The SAC contains Defendants' own stipulated admission from the ITC proceeding that all three Defendant entities "have sold for importation into the United States, imported into the United States, and/or sold after importation within the United States," the accused products.  [SAC ¶¶ 122, 124, 136, 138].  As to CJ Korea, the SAC also alleges, among other things, that it purchases goods overseas and "sells goods to end customers through overseas sales subsidiaries and affiliates," [SAC ¶ 11]; that it operated a website marketing the accused products [SAC ¶¶ 12–14]; and that it controls the activities and finances of its subsidiaries and that the manufacture, import, and sale of the accused products is done "under the license of" CJ Korea, [SAC ¶¶ 17–27, 123–124, 137–138].  As to CJ Indonesia, the SAC alleges that it manufactures the accused products abroad and then sells them for importation into the United States, [SAC ¶¶ 115–116, 121–122, 129–30, 135–36]; and that it even imported an exemplary L-Tryptophan batch into Tacoma, Washington on or about March 30, 2014, [SAC ¶¶ 119, 133].

As for CJ Indonesia, the factual allegation that it imported an exemplary L-Tryptophan batch into Tacoma, Washington on or about March 30, 2014 alone is sufficient to plead a claim that it violated § 271(g) directly.  *See* 35 U.S.C. § 271(g).

However, whether Ajinomoto has sufficiently pleaded facts to support a § 271(g) claim directly against CJ Korea is a closer question. The factual allegations that CJ Korea "sells goods to end customers through overseas sales subsidiaries and affiliates" and that the sale of its products is done "under the license of" CJ Korea do not appear to sufficiently support an inference that CJ Korea violated § 271(g) directly.

Ajinomoto does plead that CJ Korea operates a website to sell the accused products and that the website has a phone number to call to place an order. [SAC ¶¶ 12–14]. Such a website would constitute only a mere advertisement and not a "commercial offer for sale," which would not be sufficient to establish a violation of § 271 (g). *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F. 3d 1246, 1254–55 (Fed. Cir. 2000). However, Plaintiffs at this stage do not need to prove that Defendants actually sold any product through the website, but merely must allege facts that allow the reasonable inference that they have stated a plausible claim for relief. *See Iqbal*, 556 U.S. at 678.

Defendants also assert that Ajinomoto's citation to the ITC stipulation is unavailing. They argue that the "and/or" language in the stipulation allows the inference that CJ Korea merely sold the accused products for importation into the United States, but did not import the product itself. Def. Reply. 1–2. They further take issue with Ajinomoto's allegation that CJ Korea "offer such Accused Products for sale and place[] them into the stream of commerce with the awareness, knowledge, and intent that they would be used, offered for sale, and/or sold by others in New York and/or purchased by consumers in New York." Def. Mot. 8. Indeed, a defendant will not be directly liable under § 271(g) for merely selling an infringing product to another company that imports the product into the United States. *See Pfizer Inc. v. Aceto Corp.*, 853 F. Supp. 104, 105 (S.D.N.Y. 1994); *Anvik Corp. v. Sharp Corp.*, No. 07-CV-0825, 2010 WL

11416949, at *6–7 (S.D.N.Y. Aug. 11, 2010).  However, if, as Defendants assert, the stipulation could be read to say that CJ Korea merely sold the accused products for importation, it can also be read to say that CJ Korea imported the products as well.  [*See* SAC ¶¶ 122, 124, 136, 138].

Therefore, construing the complaint liberally as we must, *see Chambers*, 282 F.3d at 152, Ajinomoto has alleged sufficient facts to support its allegation that CJ Korea directly violated § 271(g).  The allegations regarding CJ Korea's website, the ITC stipulation, and the rest of the allegations included in the complaint are enough to push Ajinomoto's claim from possible to plausible.

### 2. Alternative Theories of Liability

Ajinomoto also pleads alternatively that the CJ entities, if not directly liable under § 271(g), are liable through the doctrines of principal-agency relationship, joint enterprise, or alter ego.

#### i. Principal-Agency Relationship

To plead the existence of a principal-agent relationship, "a plaintiff need only raise a sufficient inference that some sort of agency relationship existed between the purported principal and agent."  *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 344 (S.D.N.Y. 2010) (citations omitted).  "Establishment of [an agency] relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent.  In addition, the principal must maintain control over key aspects of the undertaking."  *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (citations omitted).  Indeed, "[a]n essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control."  *In re Shulman Transp. Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir. 1984).  However, "a parent-subsidiary relationship does not by

itself create a presumption of agency, nor does the use of a shared brand identity." *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217, 226 (S.D.N.Y. 2013).

As to CJ Korea, Ajinomoto pleads, among other things, that it "controls and receives all financial benefit from," "owns 100% of [the] stock value and controls the majority of [the] voting rights," and "is responsible for the debts and obligations of" CJ America and CJ Indonesia, [SAC ¶¶ 17, 24 (citing Exs. 5–6)]; that it "controls the day-to-day operations," "participates in the management of," and "shares executive officers with" CJ America and CJ Indonesia, [SAC ¶¶ 18–19, 25 (citing Exs. 5–6, 13–14)]; and that CJ Korea "represents to the public and its shareholders that CJ America and CJ Indonesia are 'Key Compan[ies] in the 'Biotechnology' business group," which produces and markets the accused products, [SAC ¶¶ 13–14 (citing Exs. 5–7, 10–12)].

As to CJ Indonesia, the SAC alleges that it "controls and directs the day-to-day operations of CJ America," with whom they submit "consolidated financial reports and cash flow statements," [SAC ¶ 51 (citing Exs. 5–6)]; and that CJ America "imports, distributes, offers for sale, and sells the Accused Products on behalf of" CJ Indonesia, and CJ Indonesia "derives substantial revenue from the sales of the Accused Products by CJ America," [SAC ¶¶ 52–53]. Last, the SAC alleges that "CJ America has the ability to bind CJ Indonesia contractually and/or make decisions on behalf of CJ Indonesia." [SAC ¶ 51].

These facts plausibly support Ajinomoto's allegations that there was a principal-agent relationship between (1) CJ Korea and CJ Indonesia and CJ America, and (2) CJ Indonesia and CJ America sufficient to withstand a motion to dismiss at this stage. *See Rates Tech. Inc. v. Broadvox Holding Co., LLC*, No. 13 CIV. 0152 SAS, 2014 WL 46538, at *4 (S.D.N.Y. Jan. 6, 2014) (finding agency relationship adequately pleaded by showing that parent was "in the same

business as its subsidiaries" and that such business was carried out by the subsidiaries "on [the parent's] behalf"); *see also Elbit Sys.*, 917 F. Supp. 2d at 225–26.

Defendants merely argue that the allegations regarding this principal agent relationship are conclusory. Def. Mot. 14–15. However, Ajinomoto has alleged sufficient facts to plausibly plead its claim.

### ii. Joint Enterprise

The complaint alternatively pleads that the three Defendants are jointly liable for direct infringement as a "joint enterprise." [SAC ¶¶ 121, 123, 135, 137]. A joint enterprise requires: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. *Akamai Techs., Inc. v. Limelight Networks*, 797 F.3d 1020, 1023 (Fed. Cir. 2015).

Defendants first assert that Ajinomoto's inconsistent pleadings doom this claim because of its other allegations that the entities control one another. Def. Mot. 14. However, as discussed above, Ajinomoto may plead inconsistent allegations as alternative theories of liability. *See supra* at Part A.

However, Defendants' argument that Ajinomoto failed to plead sufficient facts to support that the CJ entities had an equal right of control, Def. Mo. 14, is more persuasive. It is true that Ajinomoto need not use the exact "magic words" "equal right of control" to plead sufficiently a joint enterprise, but it must plead facts that can lead to the reasonable inference that the Defendants had such an equal right of control. The only allegation Ajinomoto cites to support this allegation is the averment that Defendants "operate as a unitary entity." Pl. Opp'n 17.

12

However, this paragraph of the SAC alleges that "CJ Corp. and its subsidiaries, CJ America and CJ Indonesia, operate as a unitary entity *where CJ Corp. directs and controls its subsidiaries* [in the manufacture and sale of the accused products]."  [SAC ¶ 10 (emphasis added)].  Such an allegation does not support an inference of a joint enterprise among the three corporate defendants.  The Court is unable to find any other allegations in the SAC that would support the inference that the Defendants had entered into a joint enterprise with one another.  As such, the Motion to Dismiss is granted with respect to Plaintiffs' theory of liability based on a joint enterprise relationship among the three corporate defendants.

### iii.  Alter Ego

The complaint alternatively pleads that the three Defendants are jointly liable for direct infringement as alter egos of one another.  [*See, e.g.*, SAC ¶¶ 26, 41, 118, 135].  To pierce the corporate veil or establish alter ego liability, a plaintiff must allege that (1) "the owner exercised complete domination over the corporation with respect to the transaction at issue," and (2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."  *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001).  Courts may consider the following factors when determining whether a plaintiff's allegations are sufficient:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address, and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity; and (10) intermingling of property between the entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997).

Even if Ajinomoto had sufficiently pleaded "complete domination," it does not sufficiently plead facts to address the factors as described above. Therefore, Ajinomoto has not sufficiently pleaded liability via an alter ego relationship. Accordingly, the Motion to Dismiss is granted with respect to Plaintiffs' theory of liability that the three corporate defendants are alter egos of one another.

### C. Counts III and IV: Induced Infringement Under 35 U.S.C. § 271(b)

Ajinomoto's complaint adequately pleads that each of the three Defendants, if not directly liable under § 271(g), are liable for inducing infringement under § 271(b). "For an allegation of induced infringement to survive a motion to dismiss, a complaint must plead facts plausibly showing that the accused infringer specifically intended another party to infringe the patent and knew that the other party's acts constituted infringement." *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1355 (Fed. Cir. 2018) (citation omitted). "[I]nducement requires [facts supporting] culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc).

#### 1. Inconsistent Pleadings

Defendants first assert that the Plaintiffs' inconsistent allegations in their complaint cause their inducement claims to fail because, they assert, Plaintiffs cannot allege that each defendant entity both directly infringed and induced another to infringe. They cite Ajinomoto's allegations that Defendants operated as a "unitary entity," alter egos, and as part of a joint enterprise. [*See, e.g.*, SAC ¶¶ 10, 20, 142]. A claim under § 271(b) can only survive based on allegations that a defendant induces *another* to infringe. *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760–61 (2011). However, Defendants' argument here is unpersuasive. As discussed above,

14

Ajinomoto may plead inconsistent allegations to the extent that they can be read as alternative theories of liability.  *See supra* at Part A.

### 2. Knowledge and Specific Intent

Defendants' central argument on this claim is that Ajinomoto fails to plead sufficient facts to allege that Defendants had the requisite knowledge of infringement and intent to infringe.  Def. Mot. 17.

Ajinomoto pleads that Defendants learned of the asserted patents both because of their monitoring of patents in the technology area in which they operate and because of their monitoring of Ajinomoto's activities as a direct competitor in the amino acids business, [SAC ¶¶ 144, 161]; that Defendants were confronted with and discussed the '373 patent when seeking their own, [SAC ¶ 163]; that they used the asserted patents when developing their own accused products, [SAC ¶¶ 145, 162]; and last that they "believed there was a high probability that the importation into the United States of the Accused Products infringed the [asserted patents], or took deliberate actions to avoid knowing of that fact," [SAC ¶¶ 145].  Furthermore, the complaint alleges post-suit infringement—namely, that despite having been sued in both this Court and the ITC in 2016, CJ nonetheless "continued to manufacture, import . . . and sell the Accused Products . . . throughout the United States."  [SAC ¶¶ 144, 161, 180, 189].

Ajinomoto has pleaded sufficient facts to support its claim at this stage.  *See Lubrizol Specialty Prod., Inc. v. Flowchem LLC*, 165 F. Supp. 3d 534, 540–41 (S.D. Tex. 2016); *Paone v. Broadcom Corp.*, No. 15-CV-0596, 2015 WL 4988279, at *13–14 (E.D.N.Y. Aug. 19, 2015) ("[A]llegations that defendants knew of the existence of the [] patent and continued to sell a product that infringed it are sufficient to meet the intent requirement at the pleading stage."); *see*

15

*also Glob.-Tech*, 563 U.S. at 771 (finding there was sufficient evidence to support a jury verdict that defendants violated § 271(b) where the evidence showed that the overseas defendants "knew that the product [they were] designing was for the U.S. market . . . subjectively believed there was a high probability that [it] was patented and took deliberate steps to avoid knowing that fact").

Defendants first argue that even if Ajinomoto sufficiently pleaded that Defendants had knowledge of the patents, that it also needed to plead that the induced acts constituted patent infringement. Def. Mot. 17. However, as discussed above, Ajinomoto pleads direct infringement. Indeed, the Defendants concede that at least the pleading of direct infringement as against CJ America is sufficient. Def. Mot. 6 n.4; (Tr. 12:10–15).

Defendants next assert that Ajinomoto's pleadings merely recite the legal standard and are conclusory allegations unsupported by facts. Def. Mot. 18. However, Ajinomoto has alleged sufficient facts to plausibly plead its claim.

Defendants last argue that both the ITC and Federal Circuit confirmed that the bacterial strains used to produce the Accused Products at the time of and prior to the filing of the ITC complaint (and the original complaint here) did not infringe the '655 patent. *Ajinomoto*, 932 F.3d at 1348. Defendant is simply incorrect. The ITC did find that the early strains referenced by Defendants infringed the '373 patent, and the later strains that Defendants developed during the ITC proceedings infringed both patents. [*See* SAC ¶¶ 98, 109, citing *In the Matter of Certain L-Tryptophan*, 2018 WL 8648370, at *10–14, *16–24]; *see also Ajinomoto*, 932 F.3d at 1348.

### D. Counts V and VI: Willful Infringement

Defendants also seek the dismissal of Ajinomoto's § 284 willful infringement claims. Under 35 U.S.C. § 284, "the subjective willfulness of a patent infringer, intentional or knowing,

may warrant enhanced damages." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1244 (Fed. Cir. 2017) (quoting *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933 (2016)). Such enhanced damages are appropriate where a district court finds, in its discretion, the case before it to be an "egregious case[ ] of misconduct beyond typical infringement." *Halo Elecs.*, 136 S. Ct. at 1935. Therefore, to merit enhanced damages, a defendant's conduct must be "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant or — indeed — characteristic of a pirate." *Id.* at 1932.

Defendants first take issue again with Ajinomoto's "group pleading," asserting that the SAC fails to put the Defendants on notice as to which entity knew of the patents. Def. Mot. 19. They further argue that the SAC fails to plead how or why the Defendant entities would have known that the accused products violated the patents. Def. Mot. 19–20. However, the SAC includes sufficient allegations on this point. Further, Ajinomoto alleges that prior to filing suit, Ajinomoto obtained and tested a sample of the accused products, the results of which demonstrated that Defendants had used Ajinomoto's patented methods to create its bacterial strains. [SAC ¶¶ 90–91, 102–03].

Defendants also assert that Ajinomoto's reliance on activities of the Defendants after the original Complaint was filed, such as the filing of IPR petitions, is also insufficient. [*See* SAC ¶¶ 180-181, 189-190]. Indeed, it asserts that post-filing activities, without more, cannot sustain a willful infringement claim. *See* Def. Mot. 20. However, Ajinomoto alleged more than just post-filing activities.

The allegations sufficiently plead at this stage that Defendants willfully infringed Ajinomoto's patents. *See Dynamic Data Techs., LLC v. Dell Inc.*, No. 18 CIV. 10454 (AKH), 2019 WL 10248834, at *4 (S.D.N.Y. Apr. 23, 2019) (allegations supporting inducement are

17

likewise sufficient to plead willfulness). Whether Plaintiffs will be able to carry their burden of proof with respect to willfullness remains for future determination.

## CONCLUSION

For the foregoing reasons, the motion of CJ America, Inc., CJ CheilJedang Corp., and PT. CheilJedang Indonesia to partially dismiss Plaintiffs' Second Amended Complaint, [ECF No. 71], is DENIED in part and GRANTED in part consistent with this opinion.

**SO ORDERED.**

**Date: September 27, 2021**
**New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**